UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LARRY NUNN,                          )
                                     )
        Plaintiff,                   )
                                     )        No. 4:05CV01435 CAS
                                     )                        (FRB)
v.                                   )
                                     )
                                     )
JO ANNE B. BARNHART,                 )
Commissioner of Social Security,     )
                                     )
        Defendant.                   )

**REPORT AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE**

        This matter is on appeal for review of an adverse ruling
by the Social Security Administration.  All pretrial matters were
referred to the undersigned United States Magistrate Judge pursuant
to 28 U.S.C. § 636(b) for appropriate disposition.

**I.  Procedural Background**

        On August 11, 2003, plaintiff Larry Nunn ("Plaintiff")
filed an application for Disability Insurance Benefits ("DIB")
pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401,
*et seq*., and an application for Supplemental Security Income under
Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq*.,
in which Plaintiff claimed he became disabled as of January 1,
2003.[1] (Transcript (Tr.) 69-72; 823-26.)  On initial consideration,

_____

        [1]Plaintiff originally alleged that his disability began on October 1,
1996, but amended his application to allege an onset date of January 1, 2003.
(Tr. 823, 826.)

-1-

the Social Security Administration denied Plaintiff's claim for benefits. (Tr. 58-61.) On October 14, 2003, Plaintiff requested a hearing by an Administrative Law Judge ("ALJ"). (Tr. 62-63.) On October 13, 2004, a hearing was held before an ALJ, during which Plaintiff testified and was represented by attorney Jennifer Rogers. (Tr. 37-55.) On March 6, 2005, the ALJ issued a decision denying Plaintiff's claims for benefits. (Tr. 14-26.) On August 5, 2005, the Appeals Council denied Plaintiff's request to review the ALJ's decision. (Tr. 7-11.) The ALJ's decision thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. **Evidence Before the ALJ**

A. <u>Testimony of Plaintiff</u>

At the hearing on October 13, 2004, Plaintiff testified in response to a series of questions by counsel and the ALJ. Plaintiff testified that he is fifty-one years of age, and is left-handed. (Tr. 40.) He lives with his fiancée, who helps him with numerous activities of daily living, including cooking, housework, getting in and out of the tub, and ensuring he takes his medications. Plaintiff finished the tenth grade of high school, and later obtained GED certification. He testified that he tried to attend community college for "half a year . . . [but] didn't complete it." (Tr. 41.) Plaintiff served in the military from November of 1972 to November of 1974, and received an honorable

discharge.  Id.

Plaintiff testified that he had worked all of his life in laborer-type jobs, and that he had liked working before he injured his back "some kind of way." (Tr. 41.) Plaintiff last worked at Hertz, where he remained employed for less than two months cleaning cars. (Tr. 53-54.) Plaintiff testified that getting in and out of the cars caused pain in his back, and he sought medical treatment. After he remained off work for a period of time, Hertz terminated him. (Tr. 54.) In 2001, before Hertz, Plaintiff was employed by the Hazelwood branch of the United States Postal Service as a mail carrier. From 1998 to 2001, Plaintiff worked for Leonard Metals in St. Charles as a laborer. From 1976 to 1985, Plaintiff worked for Professional Technical Services as a laborer. In 1976, Plaintiff worked for Chrysler Motors as a laborer and car assembly line worker, and finally, from July 1974 to 1976, Plaintiff worked as a clerk at the main branch of the United States Postal Service in St. Louis, Missouri. (Tr. 149.)

Plaintiff testified that his back caused significant pain despite continued medical treatment which included cortisone injections. (Tr. 41.) He also testified to a problem in his groin area where scar tissue was apparently interfering with a nerve, causing radiant pain down his left side. Plaintiff testified that, in his right groin area, a blood vessel had been cut "where one of

-3-

my -- whatever you call it -- is deteriorating."[2]  (Tr. 42.)

Plaintiff testified that, due to this condition, he cannot wear shorts and has difficulty wearing pants due to excessive friction and irritation.  (Tr. 42.)  At the hearing, Plaintiff's left arm was in a sling, and Plaintiff's attorney questioned him about it. Plaintiff testified that he had a ligament released in his left hand, and also had tendinitis in his rotator cuff, for which he was taking medication.  Plaintiff testified that his whole left side was numb, with a "pins and needles" sensation.  Plaintiff further testified that he can no longer make a fist, hold anything tightly, write his name, or generally use his left hand.  (Tr. 42.)

Plaintiff initially testified that it was very difficult for him to sit for longer than fifteen minutes, and then immediately stated that he could really sit for no longer than ten minutes.  (Tr. 43.)  Plaintiff attributed this to the pain in his groin and back.  Plaintiff testified that he could stand for about ten minutes, but felt as though his back were "collapsing", causing him to either lean on his cane or on a wall.  Plaintiff testified that he used his cane approximately ninety-five percent of the time.  Plaintiff testified that he could walk about one or one and one-half blocks before he had to take a break.  Id.

Plaintiff testified that he had "constant" pain in his back, which was exacerbated by the rain or by standing, and that

---

[2]This is an apparent reference to an atrophic condition in Plaintiff's right testicle.

-4-

his only relief was through medication that put him to sleep. (Tr. 44-45.) Similarly, Plaintiff testified that the pain in his left arm was also constant, and was worse without the splint. Plaintiff initially testified that he was unable to lift a cup of coffee with his left hand, but then stated that he could lift the cup of coffee, he just could not support it due to problems with his fingers. Plaintiff testified that he could lift a gallon of milk with his right hand. (Tr. 46-47.)

Plaintiff testified that he slept approximately four hours each night but that, due to side effects from his "blood pressure pills and water pills", he woke often to either eat or use the bathroom. (Tr. 47.) Plaintiff further testified that he took two naps during the day, and attributed this to drowsiness brought on by medication. Additional medication side effects noted by Plaintiff were rashes, spots, and circles on his body, which caused itching, scratching, and irritability. Id.

Regarding his daily activities, Plaintiff testified that his ability to cook was limited to preparing a bag of Ramen noodles for himself approximately three times per week. Regarding housework, Plaintiff testified that, while he may occasionally dust a table, his ability to help with housework was severely limited by the pain in his back and in his left hand, and he thus relied upon others to do housework for him. Plaintiff testified that he was unable to do his own laundry or wash dishes. Plaintiff testified that he was able to read and understand his bills and other written

correspondence, but that he required help with writing and completing forms. Plaintiff testified that he required a little help attending to his personal care, including occasional help exiting the bathtub. Plaintiff testified that he was trying to learn to use a towel with his right hand, but that even this was difficult. (Tr. 48-50.)

Plaintiff testified that he spent most of his day taking medications, eating, and trying to stay awake "for a minute." (Tr. 50.) Plaintiff has not engaged in his former hobbies of chess and dominoes in two and one-half years due to his inability to stay focused. Plaintiff attends church "every once in a while." Id. Plaintiff is not a member of any clubs or other organizations. Plaintiff testified that he does socialize with his family, but it was unclear how regular such visits were. (Tr. 51.) Plaintiff testified that he has not gone out to dinner or to the movies with friends or with his fiancée in over one year. Id.

Plaintiff testified that he smokes approximately one pack of cigarettes per week, and uses alcohol in moderation. Id. Plaintiff testified that he "got introduced to street drugs" two or three years ago, and tried them because of his back pain. (Tr. 52.) Upon realizing this to be an unwise decision, Plaintiff sought psychiatric treatment at "Jefferson Barracks", but later suffered a "couple of relapse" [*sic*], one of which occurred in January of 2004. Id. This relapse lasted one or two days, and

Plaintiff returned to Jefferson Barracks. Before the relapse, Plaintiff had been "clean" for approximately sixty or ninety days. Plaintiff reiterated that his illegal drug use and subsequent relapse stemmed from his attempts to "find something to help me with pain and going to the hospital and stuff." (Tr. 53.)

Following the hearing, the ALJ left the record open to await the submission of a residual functional capacity ("RFC") evaluation from Plaintiff's treating physician, Dr. Gary Miller. Plaintiff's attorney submitted Dr. Miller's report on February 11, 2005, in which Dr. Miller noted Plaintiff was able to sit for three hours, stand for four hours, and walk for one hour during an eight-hour work day, but should never lift any object weighing five pounds or more. (Tr. 150; 819-822.) Dr. Miller further noted that Plaintiff's medical conditions caused constant pain, manifested by muscle atrophy, reduced range of motion, sensory and motor disruption, irritability, grimacing and complaints. Id. Plaintiff's attorney also submitted a letter to the ALJ in support of Plaintiff's claim, in which she argued that Plaintiff's physical problems limited him to less than the full range of sedentary work and, combined with his lack of bimanual dexterity, further eroded the sedentary job base available to him. (Tr. 150-151.) Plaintiff's attorney further argued that Plaintiff's history of cocaine and alcohol abuse were immaterial to the determination of disability, as Plaintiff had testified that he had not used street drugs since January of 2004, and used alcohol only in moderation.

Id.

## III. Medical Records[3]

On October 27, 2000, Plaintiff was seen by Dr. J.H. Morrow concerning a workers' compensation claim relating to an injury which occurred on March 22, 2000. (Tr. 828-833.) At the time of the injury, Plaintiff was working for Leonard Metals Company as a parts mover. Plaintiff reported a left carpal tunnel decompression of the median nerve in 1985, but reported no complaints at all subsequent to healing. Plaintiff also reported numbness and tingling from his left elbow down into the ring of the small finger of the hand, and underwent anterior transposition of the ulnar nerve at the cubital tunnel by a physician at Christian Hospital in approximately 1987. Dr. Morrow diagnosed Plaintiff with a traumatically induced bilateral inguinal hernia, and further noted Plaintiff's prior repetitive use injuries involving his right

---

[3]Additional evidence which was not before the ALJ was submitted to and considered by the Appeals Council. This evidence consists of a medical report from J.H. Morrow, D.O., dated October 27, 2000 (Tr. 828-33); a medical report from Don S. Pruett, M.D., dated February 14, 2001 (Tr. 834-35); medical records from the Veteran's Administration Medical Center, dated June 6, 2002 to May 19, 2005 (Tr. 836-993); and a letter/brief from the claimant's representative, dated May 27, 2005 (Tr. 994-97). For the sake of consistency, these medical records submitted to the Appeals Council are incorporated into the following summary of the medical records.

The undersigned further notes that the Appeals Council mistakenly refers to Dr. Pruett as "Dr. Puett", and further notes that Dr. Morrow's report is dated October 22, 2000 when it is in fact dated October 27, 2000. (See Transcript, pages 6 and 11; pages 828-33; and pages 834-35.) The undersigned has reviewed these materials in the context of the entire record, and concludes that these misstatements are merely typographical, not substantive, errors. See Quaite v. Barnhart, 312 F. Supp. 2d 1195, 1199-1200 (E.D. Mo. 2004) (whether misstatement is typographical error is to be determined by reading misstatement in context of entire opinion.) The undersigned further notes that Plaintiff does not make note of or challenge these errors.

upper extremity.  (Tr. 409, 411.)

On January 10, 2001, Plaintiff visited the Veteran's Administration Medical Center ("VAMC"), John Cochran division, with a history of GERD, hypertension, low back pain, allergic rhinitis, depression, headache and erectile dysfunction.  (Tr. 155.) Plaintiff was prescribed Felodipine,[4] and was given trials of Viagra,[5] Fexofenadine,[6] and Bupropion.[7]

On February 14, 2001, Plaintiff saw Dr. Don Pruett in conjunction with the March 22, 2000 Workers' Compensation injury. (Tr. 834-35.)  Plaintiff gave a history of a bilateral inguinal herniorrhaphy on April 3, 2000 by Dr. Vranich, and complained of continued discomfort in both groins and in the scrotum.  (Tr. 834.) Dr. Pruett confined his exam to the groin, scrotum and right leg, and found a great deal of tenderness in both groins, a normal scrotum, and decreased sensation to touch in the right anterior upper thigh, but no decreased sensation to pinprick.  (Tr. 835.) Dr. Pruett recommended removal of the mesh grafts.  Id.

On May 10, 2001, Plaintiff visited the VAMC clinic,

---

[4]Felodipine is indicated for the treatment of hypertension. *Physician's Desk Reference*, 55th Ed., 2001.

[5]Viagra is indicated for the treatment of erectile dysfunction. *Physicians Desk Reference*, 55th Ed., 2001.

[6]Fexofenadine is indicated for the treatment of seasonal allergic rhinitis.  *Physician's Desk Reference*, 55th Ed., 2001.

[7]Bupropion is indicated for the treatment of depression. *Physician's Desk Reference*, 55th Ed., 2001.

complaining of a headache and insomnia, stating that he was not sleeping over three to four hours per night. (Tr. 158, 160.) It was noted that Plaintiff's hypertension was uncontrolled, and his Felodipine was increased. Plaintiff was also given trials of Ranitadine[8] and Trazadone.[9] Id.

On July 10, 2001, Plaintiff was seen at VAMC with complaints of headache, and was prescribed a trial of Vancanese[10] spray and referred to an ENT and to neurology. (Tr. 163-166.) Plaintiff returned on August 9, 2001 for further evaluation of chronic sinusitis, and nasal polyps, along with a large nasopharyngeal mass, were noted. (Tr. 167, 169.) Plaintiff underwent a nasal endoscopy and biopsy, and nasal polypectomy on August 28, 2001. (Tr. 169-192.) The biopsy revealed no malignancy. (Tr. 193.) Following the surgery, Plaintiff continued to follow-up with VAMC through December 18, 2001 for treatment of headache, specifically requesting prescriptions for Tylenol #3. Dr. Reena Dhanda noted, " . . . I would like him to see neuro and pain management for further w/u headaches and possible drug seeking behavior." (Tr. 197.)

On March 7, 2002, Plaintiff visited The VAMC, where

---

[8]Ranitadine is indicated for the treatment of, *inter alia*, Gastroesophageal Reflux Disease. *Physician's Desk Reference, 55th Ed., 2001.*

[9]Trazadone is indicated for the treatment of insomnia and depression. *Physician's Desk Reference*, 55th Ed., 2001.

[10]Vancanese spray is indicated for the treatment of allergic and non-allergic rhinitis. *Physician's Desk Reference*, 55th Ed., 2001.

current complaints of depression and a rash in the groin area were noted. (Tr. 198.) Regarding his depression, Plaintiff stated that he felt "hyped up and feels needs to calm down." Id. Plaintiff was prescribed Celexa.[11] (Tr. 201.) On April 9, 2002, Plaintiff visited The VAMC complaining of flaky skin on his scalp, and nasal congestion. (Tr. 202.) It was recommended Plaintiff use Guaifenesin.[12]

On April 24, 2002, Plaintiff called VAMC's telephone triage center and stated "I am in a zone, I don't know what I am going to do", and requested admittance to the hospital. (Tr. 204.) Plaintiff later presented to the John Cochran VAMC emergency room, complaining of "being in a fog", hearing voices, and seeing figures in the periphery of his vision. Plaintiff was admitted to the psychiatric ward and diagnosed with psychotic disorder and personality disorder, and cocaine addiction. He remained an inpatient in the psychiatric ward until April 30, 2002, when he signed himself out against medical advice.

Plaintiff returned to the psychiatric unit at VAMC on May 9, 2002, reported feeling angry and depressed, hearing voices, and seeing faces in front of his face, and was admitted. (Tr. 238.) Plaintiff expressed a desire to hurt someone, and specifically

---

[11]Celexa is indicated for the treatment of depression. Physician's Desk Reference, 55th Ed. 2001.

[12]Guaifenesin is indicated for relief of nasal congestion due to the common cold, hay fever or other upper respiratory allergies and nasal congestion associated with sinusitis. Physician's Desk Reference, 55th Ed. 2001.

stated he knew he "would hurt her if will not get admitted." Id. Plaintiff admitted to using cocaine and marijuana after he was discharged on April 30. (Tr. 262.) During his stay in the psychiatric unit, Plaintiff received extensive treatment for drug and alcohol dependency, and also received therapy related to getting along with others, and managing daily tasks. (Tr. 273-284.) In addition to his psychiatric symptoms during his stay in the psychiatric unit, Plaintiff complained of the physical symptoms of headache, nasal congestion, "jock itch", and flaky scalp. (Tr. 257-258, 260.) Plaintiff remained an inpatient until May 21, 2002, when he was discharged to the SATP Lodger Unit, where he continued to receive therapy for his psychiatric condition through June 17, 2002. On that date, a staff member observed Plaintiff at 1:30 p.m. in a car leaving the facility grounds, in violation of the facility's policy. (Tr. 348.) An extensive search was conducted on an hourly basis, and Plaintiff was not found within the facility. (Tr. 349.) When Plaintiff was found in his room during the 10:00 p.m. census, he was questioned on the subject and denied ever leaving the facility. Id. After considering the incident, the Treatment Team discharged Plaintiff for the infraction. (Tr. 347-349.)

Following his discharge, Plaintiff presented to the VAMC on several occasions through December 18, 2002 with assorted complaints of headaches, ear infection, itching scalp, erectile dysfunction, insomnia, esophageal reflux, depression, personality

disorder, becoming out of breath while walking, and clogged sinuses. (Tr. 359-369.) On January 15, 2003, it was noted that he was a "second no-show" for a pulmonary consult appointment. (Tr. 369.) On March 7, 2003, he visited the VAMC complaining of difficulty while reading due to poor eyesight. (Tr. 370.)

On May 7, 2003, Plaintiff visited the VAMC Urgent Care center complaining of pain and limited range of motion in his left ring finger, reporting that he had injured it two and one-half weeks ago when he was trying to help a person who was falling from a chair. (Tr. 372-74.) Plaintiff reported that the injury did not seem severe at first, but that the pain had increased and was now a shooting pain from the finger into the arm, the area had swollen, and he was unable to straighten the finger. Id. Plaintiff was diagnosed with a probable tendon/ligament injury and instructed to report to the Hand Clinic the following day. (Tr. 374.) At this time, his active medications were Beclomethasone nasal spray[13], Hydrochlorothiazide,[14] Thiamine (or Vitamin B1), Vitamin B Complex,

---

[13]Beclomethasone is indicated for the relief of symptoms of allergic and non-allergic rhinitis. Physician's Desk Reference, 55th Ed. 2001.

[14]Hydrochlorothiazide is a diuretic indicated for use in the treatment of hypertension. Physician's Desk Reference, 55th Ed. 2001.

Alprostadil[15], Felodipine[16], Fluticasone[17], Quetiapine Fumarate[18], Sertraline[19], Saline nasal spray, Albuterol[20], and Sildenafil Citrate[21]. Id. Plaintiff was prescribed Diclofenac[22] and Tylenol.

On May 8, 2003, Plaintiff reported to the VAMC Orthopedic Clinic with shooting pain from the left ring finger through his arm up to his elbow. (Tr. 374.) A positive Tinel's and a positive elbow compression test were noted. Plaintiff was diagnosed with a pseudoboutonniere of the ring finger and cubital tunnel syndrome, and was given a splint and an elbow brace. (Tr. 374-75.) He was prescribed Diclofenac and Tylenol, to use as needed. (Tr. 374.) An occupational therapy note dated May 13, 2003 indicated

---

[15]Alprostadil is indicated for use in the treatment of erectile dysfunction. Physician's Desk Reference, 55th Ed. 2001.

[16]Felodipine is indicated for use in the treatment of hypertension. Physician's Desk Reference, 55th Ed. 2001.

[17] Fluticasone is a nasal spray indicated for use in the treatment of seasonal and perennial allergic rhinitis and perennial non-allergic rhinitis. MedlinePlus, >http://www.nlm.nih.gov/medlineplus/ druginfo/medmaster/html>

[18]Quetiapine is indicated for use in the treatment of schizophrenia and mania in patients with bi-polar disorder. MedlinePlus, >http://www.nlm.nih.gov/medlineplus/ druginfo/medmaster/html>

[19]Sertraline is indicated for use in the treatment of depression. Physician's Desk Reference, 55th Ed. 2001.

[20]Albuterol is used to prevent and treat wheezing, shortness of breath, and troubled breathing caused by asthma, chronic bronchitis, emphysema, and other lung diseases. MedlinePlus, >http://www.nlm.nih.gov/medlineplus/ druginfo/medmaster/html>

[21]Sildenafil Citrate, or Viagra, is indicated for use in the treatment of erectile dysfunction. Physician's Desk Reference, 55th Ed. 2001.

[22]Diclofenac is indicated for the use in the treatment of the symptoms of arthritis and osteoarthritis. Physician's Desk Reference, 55th Ed. 2001.

complaints of pain from the splint, and padding was added to Plaintiff's splints for his comfort. (Tr. 376.) An Occupational Therapy discharge note indicates that Plaintiff failed to appear for his June 3, 2003 occupational therapy appointment, and did not call to reschedule. (Tr. 386.) The July 7, 2003 and August 8, 2003 VAMC notes indicate that Plaintiff telephoned requesting refills of Viagra, Felodipine, and Albuterol. (Tr. 376.)

On August 20, 2003, Plaintiff visited the VAMC Primary Care Clinic for a scheduled appointment for follow-up on active problems. (Tr. 378.) Plaintiff complained of an epidermal cyst in his right axial area and requested a surgical consult for its removal. Id. Plaintiff also complained of pain on the left side of his back, and stated it began while moving furniture on August 18, 2003. (Tr. 377, 387.) Plaintiff's lower back was tender to palpation, and bilateral straight leg raises were positive for pain at 30 degrees. X-rays of the lumbar spine were essentially normal with good disk spaces. (Tr. 388.) Plaintiff stated that he had taken a muscle relaxant and Diclofenac, but the pain persisted and he wanted new medications. (Tr. 377, 387.) Plaintiff was diagnosed with a back strain, and Baclofen[23] and Oxaprozin[24] were ordered.

_____

[23]Baclofen is indicated for use in the treatment of muscle spasms, to relieve pain and improve muscle movement. MedlinePlus, >http://www.nlm.nih.gov/medlineplus/ druginfo/medmaster/html>

[24]Oxaprozin is indicated for use in the treatment of osteoarthritis and rheumatoid arthritis. Physician's Desk Reference, 55th Ed. 2001.

On August 26, 2003, Plaintiff was advised via memorandum from the primary care clinic of the VAMC that his stool was positive for blood, and instructed to follow up for further testing. (Tr. 396.) On October 21, 2003, Plaintiff was seen by Dr. Koeper at VAMC in a GI consult, a colonoscopy was scheduled and performed on November 20, 2003, and the results were negative. (Tr. 798, 608-09.)

On August 28, 2003 Plaintiff reported to the emergency department complaining of pain in his left lower back which radiated to his left testicle and behind his knee to his ankle. (Tr. 391.) He denied bladder or bowel difficulty. Id. Plaintiff was prescribed Tylenol #3 and strict bed rest. Id.

On September 4, 2003 Plaintiff was seen in the Neurology clinic of the VAMC by Dr. Suur Biliciler for continued back pain despite bed rest and narcotic medication. (Tr. 548.) The impression was thoracal lumbar radiculopathy, though this was a very uncommon site for degenerative disease or herniated disc, and potential scar tissue in the inguinal hernia surgical area. (Tr. 549.)

Plaintiff was seen in conjunction with this claim by Dr. Elbert H. Cason on September 26, 2003. (Tr. 413-419.) Plaintiff complained of pain on his left side related to his prior bilateral inguinal hernia repair, pain in his right wrist and hand up to the elbow, some pain in the left wrist, pain in his left fourth finger, low back pain, and rectal bleeding. (Tr. 413.) Dr. Cason found no

-16-

evidence of active hernia or related tenderness, and stated that the prior procedures to repair Plaintiff's inguinal hernias had produced good results. Dr. Cason noted positive Phalen's and Tinel's signs bilaterally, and further noted that Plaintiff's left ring finger was in a hyper-flexed position due to torn ligaments, and noted Plaintiff's forthcoming surgery at the VAMC (which, as noted, *infra*, was performed on October 27, 2003). (Tr. 775-76). However, Plaintiff's grip strengths measured 4/5 on the left and 5/5 on the right, and Dr. Cason noted no actual loss of digital dexterity for fine and gross movements. (Tr. 415.) Finally, Dr. Cason noted that Plaintiff reported low back pain and an inability to walk more than two blocks or lift more than ten pounds. (Tr. 413.) Upon exam, Dr. Cason noted paravertebral lumbar area tenderness, but no muscle spasms, and further noted that X-rays taken on September 26, 2003 noted only a mild lateral curvature convex to the left side. (Tr. 415, 417.)

Also on September 26, 2003, Plaintiff was seen in psychological evaluation by Dr. L. Lynn Mades. (Tr. 423-24.) Dr. Mades diagnosed Plaintiff with a history of polysubstance abuse, and an antisocial personality disorder, and noted that Plaintiff reported "stress", hernia problems and carpal tunnel syndrome. Dr. Mades observed no clear picture of any specific psychiatric disturbance or thought disturbance, and no psychological disorder unrelated to the substance abuse and personality disorder. Dr.

Mades assigned a GAF of 75.[25] Dr. Mades noted no evidence of thought disturbance or evidence of psychological impairment, apart from Plaintiff's personality issues and substance abuse. (Tr. 423-24.)

On September 29, 2003, Plaintiff was seen by Dr. Jay Belani for left inguinal pain that was worse with exertion, but no voiding complaints or hematuria. (Tr. 547.) Plaintiff also stated that his right testicle had decreased in size since his hernia repair, and atrophy was noted upon exam. Id. Dr. Belani prescribed Neurontin.[26]

A functional capacity assessment was completed by Sherry Bassi, Ph.D. on October 6, 2003. (Tr. 425-427.) Dr. Bassi found that Plaintiff could follow simple directions and make basic work-related decisions. Dr. Bassi further found that Plaintiff could relate adequately to peers and supervisors, and could adapt to routine changes in a work environment, and found no evidence of a mental disorder other than substance abuse or personality disorder. Dr. Bassi further noted that Plaintiff's description of his functional impairments due to depression and anxiety were not consistent with the medical evidence, and that the medical evidence

---

[25]A GAF assessment at this level means only slight difficulty with social and occupational functioning, according to the American Psychiatry Association's Diagnostic and Statistical Manual for Mental Disorders, Fourth Edition (DSM-IV).

[26]Neurontin, or Gabapentin, is indicated as adjunctive therapy in the treatment of partial seizures with and without secondary generalization in adults with epilepsy. Physician's Desk Reference, 55[h] Ed. 2001.

suggested a capacity for simple work. (Tr. 442.)

Plaintiff was seen by Dr. Mark Schinsky on October 23, 2003 regarding his left ring finger, and complained of an inability to move the finger. (Tr. 795.) Dr. Schinsky diagnosed a left ring finger PIP joint flexion contracture, and surgery was scheduled. Id. On October 27, 2003, Plaintiff underwent a left volar plate release, check reign release and collateral ligament release by Drs. Baumgarten and Boyer. (Tr. 775-76.)

On October 29, 2003, Plaintiff was seen in Neurology consultation by Dr. Farzana Amin. (Tr. 534.) Plaintiff complained of low back pain with radiation down the left leg, which he stated began in August after lifting heavy furniture. Id. Plaintiff gave a history of working in labor-type jobs. Dr. Amin noted Plaintiff had difficulty getting in and out of a chair, and had a slow, cautious gait, but further noted that Plaintiff walked into the appointment without support, and was in mild discomfort due to back pain. (Tr. 537-538.) Dr. Amin noted that Plaintiff was reporting continued low back pain with radicular symptoms despite not having herniated discs on CT of the lumbosacral spine. (Tr. 540-541.) Dr. Amin ordered an MRI of Plaintiff's lumbosacral spine, an orthopedic consult to help improve Plaintiff's posture, a back brace, physical therapy, and increased Plaintiff's Neurontin (also called Gabapentin).

On November 10, 2003, Plaintiff was seen in consultation by Dr. Bernard Feinberg regarding medication for his psychiatric

-19-

symptoms.  (Tr. 510-12.)  Dr. Feinberg noted a history of hypertension, lumbar disc pathology and left groin pain following a hernia repair, and also noted that Plaintiff was angry over the delay in having his application for SSI approved.  (Tr. 511.) Plaintiff complained about a flash of light that intermittently appeared at the corner of his left eye, and indicated that his psychiatrist had not returned his calls to discuss treatment of this symptom.  Id.  Plaintiff further expressed concern that if he didn't get his psychiatric medications, he would become angrier. (Tr. 512.)  Dr. Feinberg noted that Plaintiff exhibited a general sense of irritation and impatience.   Dr. Feinberg diagnosed Plaintiff with cocaine and alcohol dependence, and found no evidence that Plaintiff was psychotic.  Id.  Dr. Feinberg advised that Plaintiff continue on Depakote[27], Buspirone[28], and Sertraline. Id.

Also on November 10, 2003, Plaintiff was admitted to the John Cochran VAMC with a post-operative infection of the left ring finger, and intravenous antibiotics were administered. (Tr.775-76; 464.)  During Plaintiff's stay, Dr. Gary Miller, an orthopedist,

---

[27] Depakote is an anticonvulsant. It is used to control certain types of seizures in the treatment of epilepsy.  It is also used to prevent migraine headaches and to treat various psychiatric illnesses, such as bipolar disorder and aggression.  MedlinePlus, >http://www.nlm.nih.gov/medlineplus/ druginfo/medmaster/html>

[28]Buspirone is used to treat anxiety disorders, or in the short-term treatment of symptoms of anxiety.  MedlinePlus, >http://www.nlm.nih.gov/medlineplus/ druginfo/medmaster/html>

noted that Plaintiff's behavior was consistently inappropriate and often menacing, and further noted that Plaintiff constantly demanded medication. (Tr. 733.) According to a nurse's note of November 12, 2003, Plaintiff stood at the medicine cart and demanded to be given all of his medicines, including his pain medicine. (Tr. 734.) The nurse reminded Plaintiff that she had already given him his pain medication, and Plaintiff left. <u>Id.</u> The nurse's note further indicates that, whenever a new nurse arrives on duty, Plaintiff approaches her and requests medicine. <u>Id.</u> Plaintiff was released on November 14, and continued to follow up in the orthopedic clinic and in occupational therapy through December 4, 2003.

On November 20, 2003 Plaintiff was seen in physical therapy complaining of chronic low back pain and requesting a cane, and a cane was provided. (Tr. 507, 502.)

On December 11, 2003, Plaintiff was seen in physical therapy at VAMC complaining of pain in his neck and left shoulder over the past seven days with no history of trauma. (Tr. 518.) Plaintiff stated that he felt a sharp, stinging pain in his shoulder when he stretched his neck, and felt that the shoulder was "grinding". Radiological studies revealed mild degenerative changes involving the acromioclavicular joint with minimal spurring. (Tr. 518.) As shoulder impingement testing was negative, Plaintiff was diagnosed with osteoarthritis, and physical therapy exercises were recommended. On this same date, Plaintiff was seen

in occupational therapy with complaints of limited range of motion of his left ring finger, and was instructed to continue blocking exercises. (Tr. 603.)

On December 12, 2003 Plaintiff was seen in physical therapy at VAMC, and given a TENs unit to treat his low back pain. (Tr. 514.) Plaintiff complained of pain that was six out of ten on the 0-10 pain scale, and stated that he had been experiencing back pain since October 15, 2003. Id. On December 16, 2003, Plaintiff was seen by Dr. Stephen Brenner, a neurologist at VAMC. (Tr. 597-98.) Dr. Brenner's impression was low back pain without definite cause, although some arthritis in the facet joints was noted.

On December 17, 2003, Plaintiff was admitted to the psychiatric unit of Jefferson Barracks Veteran's Administration Medical Center after he attacked, beat and attempted to choke his girlfriend, and otherwise displayed violent outbursts. (Tr. 454.) Plaintiff stated that this had happened three times in his life, and that he did not remember the incident. Plaintiff reported ongoing stress due to chronic pain and due to problems in his relationship with his girlfriend, and stated that he suffered from mood swings and physical aggression which caused him to punch walls and become threatening. Plaintiff stated that lately he was becoming increasingly more out of control, often became angry over little things, and was unable to predict his behavior once he became angry. Id. Plaintiff admitted to his history of cocaine use in the past, but denied any use immediately prior to his

admission.  Plaintiff's drug screen was, however, positive for cocaine.  (Tr. 455.)

While an inpatient, Plaintiff was assessed by Dr. Steven Menke on December 17, 2003.  (Tr. 730.)  Plaintiff reported pain in his low back and hand.  Id.  Dr. Menke noted that Plaintiff's self-report of pain did not correspond with his non-verbal pain behaviors, such as grimacing and limping.  Id.  Dr. Menke noted that Plaintiff walks with a cane, but ambulates well without.  (Tr. 731.)  Dr. Menke noted that Plaintiff had a normal gait in that he walked briskly, his arms swung freely, and he held his head erect. (Tr. 732.)

On December 29, 2003, Plaintiff was seen in the pain clinic of the John Cochran VAMC.  (Tr. 543-44.)  He complained of pain at multiple sites, including his low back, neck, groin, and head.  Id.  Plaintiff stated that Oxycodone[29] was not relieving his pain, and demanded stronger medications.  (Tr. 544.)  Plaintiff refused intervention such as an epidural.  Id.  Plaintiff was given Tramadol,[30] Flexeril,[31] and Neurontin, and referred to a pain management group.  Id.  On December 30, 2003, Plaintiff was seen by Dr. Miller, who noted that Plaintiff was profoundly incapacitated

---

[29]Oxycodone, or Percocet, is indicated for the relief of moderate to moderately severe pain.  Physician's Desk Reference, 55th Ed. 2001.

[30]Tramadol is indicated for the management of moderate to moderately severe pain.  Physician's Desk Reference, 55th Ed. 2001.

[31]Flexeril is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute, painful musculoskeletal conditions.  Physician's Desk Reference, 55th Ed. 2001.

by his left hand problem as Plaintiff was left handed and did manual labor. (Tr. 680.) Dr. Miller believed Plaintiff's condition rendered him unable to work, and stated he did not expect the condition to improve.

On January 15, 2004, Plaintiff was seen in the Neurology clinic of the VAMC by Dr. Steven Brenner, complaining of persistent pain in his back, testicles and groin. (Tr. 672.) Dr. Brenner noted that Plaintiff's bone scan did not show any problem, despite Plaintiff's report of severe back pain "all the time." Id. Dr. Brenner noted mild tenderness of Plaintiff's low back, and noted Plaintiff had good power in his arms and legs. (Tr. 672, 674.) Dr. Brenner's impression was low back pain and shoulder pain without a definite cause. (Tr. 674.)

On February 10, 2004, Plaintiff was seen in the Primary Care clinic of VAMC for a follow-up regarding his blood pressure. (Tr. 667.) It was noted he was alert and oriented, in no acute distress, and ambulatory using a cane. (Tr. 669.)

On February 20, 2004, Plaintiff underwent a compensation and pension exam with Dr. William Burke. (Tr. 486.) It was noted that Plaintiff reported continued back pain and that, although MRI and CT scans were abnormal, the findings were insufficient to explain Plaintiff's degree of pain. On that same day, Plaintiff underwent a nerve conduction study of his feet and legs in the clinical neurophysiology laboratory at the VAMC, the results of which were normal and not diagnostic of radiculopathy. (Tr. 449.)

Plaintiff was seen by Dr. Brenner on February 26, 2004 with complaints of pain in his back and groin, and scar tissue from the prior hernia repairs. (Tr. 658.) Dr. Brenner noted no tenderness of the lumbosacral spine region, good power in the upper and lower extremities, and a normal sensory exam for touch and pain. (Tr. 658-59.)

On March 18, 2004, Plaintiff was seen by Dr. Oruwari, and reported he was unable to attend his anger management group due to financial concerns. (Tr. 651.) Plaintiff complained of insomnia, and stated his medications were no longer helping. Plaintiff was also seen that same date by Dr. Kao in the ophthalmology clinic, complaining of a flashing bright teardrop in his left temporal field. (Tr. 653.) Plaintiff was referred to the retina clinic for further evaluation.

On June 15, 2004, Plaintiff was seen by Dr. Brenner complaining of pain in his testicles as well as low back pain. (Tr. 639.) Dr. Brenner prescribed Flexeril and referred Plaintiff to the pain clinic for evaluation and treatment with epidural steroids. Id.

On August 19, 2004, Plaintiff was seen in occupational therapy complaining of pain in his upper back, superior shoulder, and neck pain on the left side. (Tr. 575.) On August 23, 2004, Plaintiff was seen in occupational therapy at VAMC complaining of pain in his upper back, and in the superior shoulder and neck on the left. (Tr. 473.) Plaintiff reported a slight decrease in pain

level after heat therapy was rendered.  <u>Id.</u>  On August 24, 2004
Plaintiff was seen at the VAMC with a complaint of hearing loss,
tinnitus, and an itching sensation in his ears.  He stated that he
worked at Chrysler, where he was surrounded by some noise exposure.
Audiology tests were within normal limits.  (Tr. 475-478.)
Plaintiff was seen again in occupational therapy for shoulder pain
on September 19, 2004.  (Tr. 469.)

On October 12, 2004, Plaintiff underwent a lumbar spine
CT per Dr. Brenner following his complaints of severe pain in his
groin.  (Tr. 841.)  The CT revealed severe facet osteoarthritis at
L5-S1, more on the right than on the left, and slight degenerative
spinal canal stenosis at L4-L5 and L5-S1 due to a bulging disk,
ligamentum flavum hypertrophy and facet osteoarthritis.  (Tr. 842.)

On November 17, 2004, Plaintiff saw Dr. Brenner with
complaints of pain in his low back and left groin.  (Tr. 876.)  Dr.
Brenner noted that Plaintiff had failed to show for a scheduled
EMG.  <u>Id.</u>  Plaintiff told Dr. Brenner that it had been years since
his last cocaine use, but Dr. Brenner noted Plaintiff's psychiatric
admission during the previous year during which he tested positive
for cocaine.  <u>Id.</u>  Dr. Brenner's assessment as low back pain and
facet arthritis on CT of the lumbo-sacral spine, recommended facet
injections, and referred Plaintiff to Dr. Metzger in Psychology for
pain assessment and guidelines for pain management.  (Tr. 879.)

On November 24, 2004, Plaintiff was seen in the
orthopedic clinic of the VAMC complaining of pain and a grinding

sensation over his left shoulder. (Tr. 867.) Plaintiff had a positive Tinel's and a negative Phalen's. On December 6, 2004, Plaintiff underwent an MRI of his cervical spine due to his complaints of pain and weakness in his left arm. (Tr. 840.) The MRI revealed mild degenerative disc disease with mild disc bulges from C3-C4 to C6-C7, no large disc herniation or canal stenosis, and loss of normal cervical lordosis. (Tr. 841.)

On December 9, 2004, Plaintiff was seen by Dr. Miller with complaints of pain and grinding in his left shoulder with pain radiation down the arm to the elbow and forearm, with numbness in the hand. (Tr. 864.) Plaintiff declined cubital tunnel testing. (Tr. 865.) Dr. Miller noted that Plaintiff had mild shoulder pain controlled with Vicodin[32].

On December 22, 2004, following Plaintiff's October 13, 2004 hearing before the ALJ, Dr. Miller completed a Physical Medical Source Statement as requested by Plaintiff's attorney. (Tr. 819-22.) Dr. Miller provided the diagnoses of ulnar nerve compression at the elbow, carpal tunnel syndrome on the right, cervical degenerative disc disease, hand osteoarthritis status post infection, left ring finger PIP contracture, clinical lumbar spondylosis, and left rotator cuff tendinitis. (Tr. 819.) Dr. Miller opined that, in an eight-hour workday, Plaintiff could sit for three hours, stand for four hours, walk for one hour, and

---

[32]Vicodin is indicated for use in the treatment of moderate to moderately severe pain. Physician's Desk Reference, 55th Ed. 2001.

should never lift or carry even five pounds.  (Tr. 819-20.)  Dr. Miller opined that Plaintiff was limited in his ability to handle and work with small objects with both his left and right hand. (Tr. 820.)  Dr. Miller indicated no limitations in Plaintiff's visual or communicative abilities, or in his ability to balance. (Tr. 820-21.)  Dr. Miller opined that Plaintiff could reach above his head and stoop occasionally, and could tolerate frequent exposure to odors, dust and noise.  (Tr. 821.)  Dr. Miller noted that Plaintiff's pain was constant, and that his objective symptoms were muscle atrophy, reduced range of motion, and sensory and motor disruption.  Id.  Dr. Miller noted that Plaintiff should not use a cane, and that he would require hourly breaks, and anticipated that Plaintiff's limitations had lasted and would continue to persist for twelve continuous months.  Id.

On January 18, 2005, Plaintiff saw psychologist Fredric Metzger, Ph.D., as referred by Dr. Brenner for evaluation concerning Plaintiff's use of narcotic medication.  (Tr. 856.) Plaintiff complained of pain in his low back, right leg, and left shoulder.  Id.  Plaintiff told Dr. Metzger that his back pain was bad enough to prevent him from working, but not bad enough to warrant surgery.  (Tr. 857.)  Dr. Metzger noted that Plaintiff's self-reported history of his past illicit drug use was inconsistent with information found in the medical records, and was further so "very vague" that Dr. Metzger was unable to offer a definitive conclusion regarding either Plaintiff's current substance abuse

status, or his overall clinical picture. (Tr. 861, 863.) Dr. Metzger diagnosed cocaine dependence with status of use unknown, pain associated with psychiatric features and a general medical condition, and rule out bipolar disorder versus substance induced mood disorder, and assigned Plaintiff a GAF of 55. (Tr. 862-63.) Dr. Metzger concluded that documented abstinence from illicit drugs was required before a definitive diagnosis could be made, and recommended random drug testing. Id. Dr. Metzger noted that Plaintiff engaged in considerable catastrophic interpretations of his pain, and limited his physical activity considerably as a result. Id. Dr. Metzger noted that Plaintiff had enjoyed good results with the use of physical therapy for shoulder pain, and opined that Plaintiff may enjoy similar results with his back, if Plaintiff's fears could be addressed to the extent he would be willing to try. Id. Dr. Metzger found that the use of opioid medications was not indicated because Plaintiff was high-risk for misuse of substances. (Tr. 861, 863.)

Plaintiff was seen in the orthopedic clinic on January 19, 2005 for a follow-up exam for shoulder pain. (Tr. 853.) Due to Plaintiff's history of illicit drug use and suspected misuse of prescribed narcotics, Plaintiff's narcotics prescriptions were discontinued. (Tr. 854.) It was noted that Plaintiff became "very upset, almost to the point of being belligerent with the suggestion that he could not stay on Vicodin for pain and did not want to try a cortisone injection." Id. Plaintiff eventually agreed to a

trial of cortisone injection. Id.

A CT scan of Plaintiff's neck performed on January 20, 2005 revealed soft tissue fullness of the posterior nasopharynx without evidence of discrete mass. (Tr. 839-840.) An MRI of Plaintiff's left shoulder performed on February 24, 2005 revealed mild osteoarthritis of acromioclavicular joint with inferior spurring and mild impingement, an intact rotator cuff, and cystic change at the attachment of supraspinatus tendon, likely representing degenerative change. (Tr. 838-39.) On April 5, 2005, Plaintiff requested pain medication, reporting a lot of back pain in his low back. (Tr. 846-47.) Plaintiff reported that he did not have the facet injections as recommended by Dr. Brenner, stating that he could not find out when they were to be given. (Tr. 847.) On April 14, 2005, Plaintiff called the VAMC primary care unit requesting a refill of his medications, and was informed that his Vicodin would not be renewed due to his history of drug abuse. (Tr. 846.)

A May 19, 2005 EMG/NCV report noted that a nerve conduction study of both Plaintiff's hands and arms was normal. (Tr. 846.) There was no electrophysiological evidence consistent with neuropathy or entrapment neuropathy, but the possibility of cervical radiculopathy as a cause of the symptoms could not be ruled out.

## IV.  **The ALJ's Decision**

The ALJ found that Plaintiff had probably performed no substantial gainful activity since January 1, 2003, his alleged onset date of disability, although Plaintiff had some minor reported earnings for the first and second quarters of 2003. (Tr. 18, 24.) The ALJ found that the medical evidence established that Plaintiff had status-post release of his left ring finger contracture, mild bilateral carpal tunnel syndrome without significant functional limitations, mild degenerative disc disease of the lumbosacral spine, status-post bilateral inguinal hernias, antisocial personality disorder, and a history of polysubstance dependence. (Tr. 24.) The ALJ found that there existed no impairment or combination of impairments that met or equaled in severity the requirements of any impairment listed in Appendix 1, Subpart P, Regulations Number 4. Id. The ALJ found that Plaintiff's allegation of impairments severe enough to prevent him from working was not credible. Id. The ALJ found that Plaintiff had the residual functional capacity to perform the physical exertional and non-exertional requirements of work, except probably for lifting or carrying more than ten pounds frequently, or more than twenty pounds occasionally. The ALJ found that, although Plaintiff was probably unable to perform any past relevant work, he had a residual functional capacity for a full range of at least light work. The ALJ determined that, based on an exertional

functional capacity for at least light work, and the Plaintiff's age, education and work experience, Plaintiff was "not disabled" per 20 CFR 404.1569 and 416.969 and Rules 202.13-202.15, Table Number 2, Appendix 2, Subpart P, Regulations Number 4. The ALJ further found that Plaintiff was not under a "disability" as defined in the Social Security Act at any time through the date of the decision, and that Plaintiff had no uncontrollable substance use disorder that prevented him from working. (Tr. 14-26.)

The ALJ noted that the majority of the medical records submitted in the case consisted of outpatient and some inpatient treatment records from a Veteran's Administration ("VA") medical facility, dated from January 2001 to August 2004, much of which predated Plaintiff's alleged onset date of disability. (Tr. 19.) The ALJ found that the medical evidence did not establish any impairment or combination of impairments that met or equaled in severity the requirements of any impairment listed in Appendix 1, Subpart P, Regulations Number 4. (Tr. 19.)

## V. Discussion

To be eligible for Social Security disability benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that he is disabled. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker v. Secretary of Health & Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner utilizes a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by considering the claimant's work activity. If the claimant is engaged in substantial gainful activity, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether

the claimant has the residual functional capacity to perform his or her past relevant work. If so, the claimant is not disabled. If not, the burden then shifts to the Commissioner to prove that there are other jobs that exist in substantial numbers in the national economy that the claimant can perform. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001), Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000). Absent such proof, the claimant is declared disabled and becomes entitled to disability benefits.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Young v. Shalala, 52 F.3d 200 (8th Cir. 1995), citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). Substantial evidence is less than a preponderance but enough that a reasonable person would find adequate to support the conclusion. Briggs v. Callahan, 139 F.3d 606, 608 (8th Cir. 1998). To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1.   The credibility findings made by the ALJ;

2.   The plaintiff's vocational factors;

3.   The medical evidence from treating and consulting physicians;

4.   The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;

5.   Any corroboration by third parties of the

-34-

plaintiff's impairments;

　　　6.　The testimony of vocational experts, when
　　　　　required, which is based upon a proper
　　　　　hypothetical question which sets forth
　　　　　the plaintiff's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86
(8th Cir. 1992), quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85
(8th Cir. 1989).


　　　The Court must also consider any "evidence which fairly

detracts from the ALJ's findings." Groeper v. Sullivan, 932 F.2d

1234, 1237 (8th Cir. 1991); see also Briggs, 139 F.3d at 608.

However, where substantial evidence supports the Commissioner's

decision, the decision may not be reversed merely because

substantial evidence may support a different outcome. Briggs, 139

F.3d at 608; Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir.

1992), citing Cruse, 867 F.2d at 1184.

　　　In the case at bar, Plaintiff claims that the ALJ's

decision is not supported by substantial evidence because the ALJ

erred in determining Plaintiff's residual functional capacity, and

cites Singh v. Apfel, 222 F.3d 448 (8th Cir. 2000) and Lauer v.

Apfel, 245 F.3d 700 (8th Cir. 2001) in support. Plaintiff further

argues that the ALJ failed to consider subjective complaints under

the standards of Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984),

in part because the ALJ failed to properly consider the opinions of

Drs. Miller, Brenner, Metzger, Oruwari and Bassi. Finally,

Plaintiff argues that, because the record established that

Plaintiff had significant non-exertional impairments, the ALJ's

-35-

decision is not based upon substantial evidence because it lacks vocational expert testimony. The undersigned will first address Plaintiff's arguments concerning the ALJ's determination of Plaintiff's RFC.

A.  RFC Determination

As set forth, *supra*, the ALJ in this matter determined that Plaintiff was probably unable to perform past relevant work, but had the residual functional capacity for a full range of at least light work.[33]  (Tr. 21.)  Plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole for the reason that it fails to point to medical evidence to support the conclusion that Plaintiff is capable of returning to work, and further argues that the ALJ failed to properly consider all of Plaintiff's medically determinable impairments.  Plaintiff also contends that the ALJ erred in discrediting the opinion of Dr. Miller, Plaintiff's alleged treating physician.  Plaintiff also submits that the ALJ should have more fully and fairly developed the record by seeking clarification from Dr. Miller, and finally argues that the ALJ should have obtained additional medical evidence to support his RFC determination.

---

[33]Light work involves the following activities:  lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a good deal of walking or standing; or sitting most of the time with some pushing and pulling of arm or leg controls.  20 C.F.R. §§ 404.1567(b), 416.967(b).

Residual functional capacity is what a claimant can do despite his limitations. 20 C.F.R. §404.1545, <u>Lauer</u>, 245 F.3d at 703. At the fourth step, while the burden of proof is still upon the claimant, the Commissioner determines whether the claimant has the RFC to perform his or her past relevant work, and if so, the claimant is determined not disabled. <u>Pearsall</u>, 274 F.3d at 1217. If not, however, the process continues to step five, where the burden shifts to the Commissioner to prove both that the claimant retains the RFC to perform other kinds of work, and that such work exists in substantial numbers in the national economy. <u>Singh</u>, 222 F.3d at 451, <u>citing</u> <u>Nevland</u>, 204 F.3d at 857. The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations. <u>Anderson v. Shalala</u>, 51 F.3d 777, 779 (8th Cir. 1995); <u>Goff v. Barnhart</u>, 421 F.3d 785, 793 (8th Cir. 2005); 20 C.F.R. §§ 404.1545(a), 416.945(a). A claimant's RFC is a medical question, however, and some medical evidence, along with all other relevant, credible evidence in the record, must support the ALJ's RFC determination. <u>Id.</u>; <u>Hutsell v. Massanari</u>, 259 F.3d 707, 711-12 (8th Cir. 2001); <u>Lauer</u>, 245 F.3d at 703-04; <u>McKinney v. Apfel</u>, 228 F.3d 860, 863 (8th Cir. 2000). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. <u>Hutsell</u>, 259 F.3d at 712. However, although an ALJ must determine the claimant's RFC based

upon all relevant evidence, the ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001), <u>McKinney v. Apfel</u>, 228 F.3d 860, 863 (8th Cir. 2000).

The undersigned turns first to Plaintiff's contention that the ALJ failed to undertake the proper analysis before discrediting the opinion of Dr. Miller, whom Plaintiff claims was his treating physician. Ordinarily, a treating physician's opinion should not be discarded and is entitled to substantial weight. <u>Singh</u>, 222 F.3d at 452, <u>citing</u> <u>Ghant v. Bowen</u>, 930 F.2d 630, 639 (8th Cir. 1991.) A treating physician's opinion will be granted controlling weight, provided it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record. <u>Singh</u>, 222 F.3d at 452, <u>citing</u> <u>Kelly v. Callahan</u>, 133 F.3d 583, 589 (8th Cir. 1998.) This is so because a treating source has the best opportunity to observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.
>
> 20 C.F.R. § 404.1527(d)(2).

When a treating physician's opinion is not given controlling weight, the Commissioner must look to various factors in determining what weight to afford the opinion. Id. Such factors include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating source provides support for his findings, whether other evidence in the record is consistent with the findings, and the treating source's area of specialty. Id. The Regulations further provide that the Commissioner "will always give good reasons . . . for the weight [given to the] treating source's opinion." Id.

In this case, the ALJ did not err in his determination to discredit the statements contained within Dr. Miller's December 22, 2004 physical capacities form, submitted at the Plaintiff's attorney's request following the October 13, 2004 hearing. The ALJ noted that while Dr. Miller's form, on its face, supported Plaintiff's allegation of total disability, it was not credible for many reasons. (Tr. 21.) First, it was inconsistent with the other medical evidence in the record. Id. The ALJ found no clear evidence in the record as a whole that Plaintiff suffered from certain impairments listed by Dr. Miller, including cervical spine degenerative disc disease or rotator cuff syndrome. Id. The ALJ further noted that Dr. Miller hardly qualified as Plaintiff's general "treating physician", as his treatment of Plaintiff was largely limited to the left finger, and further noted that,

although Dr. Miller is an orthopedist, his expertise appeared limited to hands and fingers. Id. The ALJ further noted that diagnostic tests such as CT scans, bone scans, and EMG/NCV studies performed by other physicians who have treated Plaintiff did not confirm much in the way of positive findings about Plaintiff's other allegedly affected musculoskeletal areas, and Dr. Miller's opinions about these areas were therefore speculative. Id. The ALJ further noted that it was unclear when Dr. Miller last saw Plaintiff. Id. Dr. Miller stated that Plaintiff was disabled as of December 30, 2003; however, his report is dated nearly one full year later, and there is no documented evidence that Dr. Miller saw Plaintiff after December 30, 2003. (Tr. 21-22.) The ALJ noted that Plaintiff did not even list Dr. Miller as a treating physician who prescribed medication regularly for him, and further noted that Dr. Miller was the only doctor in the record who ever stated or implied that Plaintiff was disabled. (Tr. 22; 139.) Finally, the ALJ noted that Dr. Miller's report was obviously the product of a pre-printed form questionnaire, submitted by Plaintiff's attorney, which contained a number of leading questions and inducements, and as such, was designed not for objectivity, but for verification of preconceived conclusions. (Tr. 22.) The ALJ concluded as follows: "For these reasons, the undersigned is skeptical not only about the validity of these other musculoskeletal impairments as being significantly limiting, but also about the left ring finger being a genuinely long-term major concern." (Tr. 22.) The undersigned

therefore finds that the reasons given by the ALJ to discredit Dr. Miller's report are supported by substantial evidence and good reasons.

Plaintiff further submits that the ALJ erred in failing to re-contact Dr. Miller. "While the ALJ has an independent duty to develop the record in a social security disability hearing, the ALJ is not required to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." Goff, 421 F.3d at 791. Furthermore, the Commissioner's regulations require the ALJ to re-contact physicians when the evidence is consistent but is not sufficient to decide whether the claimant is disabled; or, if after weighing the evidence, the ALJ is unable to decide whether the claimant is disabled. 20 CFR § 416.927(c)(3).

In the instant matter, there were no undeveloped "crucial issues" requiring the ALJ to re-contact Dr. Miller. Furthermore, 20 CFR § 416.927(c)(3)is not helpful to the Plaintiff. The ALJ found Dr. Miller's report inconsistent, and there was no issue concerning the sufficiency of the report. Finally, the ALJ, after weighing all of the relevant, credible evidence in the record as a whole, was able to decide that Dr. Miller's opinion did not qualify as probative evidence of Plaintiff's true level of functioning. It was therefore not necessary for the ALJ to re-contact Dr. Miller.

Plaintiff next argues that the ALJ's finding of Plaintiff's RFC is not supported by the medical evidence, and that the ALJ erred in failing to consider the effects of Plaintiff's

mental impairments and substance abuse. However, a review of the ALJ's decision reveals that it was based upon substantial evidence on the record as a whole. The ALJ specifically noted the report of Dr. Elbert H. Cason, who saw Plaintiff in consult on September 26, 2003. (Tr. 20.) Dr. Cason noted no muscle spasm or neurological deficit or nerve root compression in Plaintiff's back, and, although Plaintiff had positive Tinel's and Phalen's tests, he displayed a 4/5 grip strength on the left and a full 5/5 grip strength in the right hand, and displayed no actual loss of digital dexterity for fine and gross movements. Dr. Cason further noted no active hernia or related tenderness, an x-ray of the lumbosacral spine revealed only mild lateral curvature convex to the left side, and all other physical signs were normal or unremarkable.

The ALJ also noted Plaintiff's extensive course of treatment at the VAMC, and noted that Plaintiff's treatment there was primarily conservative. (Tr. 19); See Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998)(conservative treatment is inconsistent with allegations of disabling pain).

The ALJ noted the report of the consultative examiner, Dr. L. Lynn Mades, who opined that Plaintiff had no psychological impairment that would prevent him from engaging in sustained employment. (Tr. 20-21.) The ALJ noted that Dr. Mades diagnosed only a history of polysubstance dependence and an antisocial personality disorder. (Tr. 20.) The ALJ further noted that although Plaintiff alleged "stress", Dr. Mades noted no

-42-

psychological impairment that would prevent Plaintiff from engaging in sustained employment. The ALJ noted that Dr. Mades assigned Plaintiff a GAF of 75, or only slight difficulty with social and occupational functioning. (Tr. 21.)

Plaintiff argues that the opinion of Dr. Fredric Metzger, Ph.D., negates the other evidence of record supporting the ALJ's decision, and is inconsistent with the ALJ's conclusion that Plaintiff's substance use and alleged mental impairment imposed no long-term effects. (Tr. 862-64.) A review of Dr. Metzger's opinion, however, reveals that it is not particularly helpful to Plaintiff, particularly because it is not conclusive of either substance abuse or mental illness. Dr. Metzger noted that Plaintiff's self-reported history of his illicit drug abuse was inconsistent with information found in the medical records, and was further so "very vague" that Dr. Metzger was unable to offer a definitive conclusion regarding either Plaintiff's current substance abuse status, or his overall clinical picture. (Tr. 861, 863.) Dr. Metzger further found that Plaintiff engaged in considerable catastrophic interpretations of his pain, and limited his physical activity considerably as a result. Id. Dr. Metzger noted that Plaintiff had enjoyed good results with the use of physical therapy for shoulder pain, and suggested that Plaintiff may enjoy similar results regarding his back, if he could be convinced to try. (Tr. 863); See Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (impairments controllable or amenable to

-43-

treatment do not support a finding of total disability).

Plaintiff further argues that the report of Psychologist Bassi was not properly considered, and that it supports the contention that Plaintiff has at least a moderate limitation due to mental illness. Psychologist Bassi's report, however, is not helpful to Plaintiff, as she noted that Plaintiff was able to follow directions, make basic work-related decisions, relate adequately to peers and supervisors, and adapt to routine changes in a work environment. (Tr. 427.)

Plaintiff also contends that the ALJ failed to properly consider the impact of Plaintiff's alleged mental impairments and substance abuse on his overall condition. The ALJ found no support in the record for Plaintiff's allegation of depression, and stated that, during the hearing, Plaintiff exhibited no obvious signs of depression, anxiety, memory loss or other mental disturbance. (Tr. 23.) The ALJ further noted that no doctor or other qualified person had stated or implied that Plaintiff's alleged physical symptoms are the product of any mental impairment, and further noted that Plaintiff's basic abilities to think, understand, communicate, concentrate, get along with others and handle normal work stress have never been significantly impaired on any documented, long-term basis, regardless of Plaintiff's illegal substance use status. (Tr. 22-23.) The ALJ noted no documented, serious deterioration in Plaintiff's personal hygiene or habits, daily activities or interests, effective intelligence, reality

contact, thought processes, memory, speech, mood and affect, attention span, insight, judgment, or behavior patterns over any extended period of time. (Tr. 23.) The ALJ found that, aside from a period of time between April and June 2002, a time pre-dating Plaintiff's alleged onset of disability, and the one-week hospitalization in December 2003, which appeared to be cocaine-induced, the record demonstrated no significant acute mental disturbances. Id. The ALJ further noted that, even if Plaintiff were a frequent drug user, such use had persisted for many years and never prevented Plaintiff from maintaining full-time employment, and that indeed, some of Plaintiff's best working years were after what he said was the onset of his substance use. Id.; Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992) (per curiam); Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990) (A condition that was present but not disabling during working years and has not worsened cannot be used to prove a present disability).

Of further note are the aforementioned materials submitted to and reviewed by the Appeals Council following the ALJ's determination to deny benefits; namely the medical report from Don S. Pruett, M.D., dated February 14, 2001 (Tr. 834-35); medical records from the Veteran's Administration Medical Center, dated June 6, 2002 to May 19, 2005 (Tr. 836-993); and a letter/brief from the claimant's representative, dated May 27, 2005 (Tr. 994-97). When new evidence is submitted and considered by the Appeals Council, the reviewing court must then determine

"whether there is substantial evidence in the administrative record, which now includes the new evidence, to support the ALJ's decision." Richmond v. Shalala, 23 F.3d 1441, 1444 (8th Cir. 1994), citing Nelson v. Sullivan, 966 F.2d 363, 366 (8th Cir. 1992); See also Frankl v. Shalala, 47 F.3d 935, 938-39 (8th Cir. 1995). This requires the reviewing court to engage in the "peculiar task" of essentially speculating on how the ALJ would have weighed the new evidence. Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1994). The significance of these additional materials and reports and the extent to which they affect the determination as to whether there is substantial evidence in the record to support the ALJ's decision has been discussed previously herein. After review of the ALJ's decision, supplemented by the additional evidence submitted to the Appeals Council, the undersigned finds that the ALJ's decision is supported by substantial evidence on the record as a whole.

Finally, Plaintiff argues that the holdings in Singh and Lauer impose a duty upon the ALJ to produce evidence from a physician indicating that Plaintiff can lift a certain weight or walk a certain distance. This argument, however, is contrary to both Agency policy concerning RFC determinations, and to Eighth Circuit precedent. Plaintiff is correct that an ALJ's decision regarding a claimant's RFC must be based upon medical evidence. Hutsell, 259 F.3d at 711-12. "The need for medical evidence, however, does not require the Secretary to produce additional

evidence not already within the record." <u>Anderson</u>, 51 F.3d at 779. "An ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." <u>Id.</u>, <u>citing</u> <u>Naber v. Shalala</u>, 22 F.3d 186, 189 (8th Cir. 1994). For the reasons discussed, *supra*, the evidence in the record provided a sufficient basis for the ALJ's decision regarding Plaintiff's RFC, and the ALJ was under no obligation to obtain additional medical evidence regarding Plaintiff's abilities.

A review of the ALJ's determination of Plaintiff's RFC reveals that he properly exercised his discretion and acted within his statutory authority in evaluating the evidence on the record as a whole. The ALJ based his decision on all of the relevant, credible evidence of record, including the objective medical evidence and medical opinion evidence, and further properly discredited the opinion of Dr. Miller after conducting the proper analysis. For the foregoing reasons, the undersigned finds that the ALJ's determination of Plaintiff's residual functional capacity was based upon substantial evidence on the record as a whole.

B. <u>Plaintiff's Subjective Complaints</u>

Plaintiff next contends that the ALJ's decision runs afoul of <u>Polaski</u> in that it erroneously found Plaintiff's testimony regarding his subjective complaints not credible. Plaintiff specifically argues that, in this analysis, the ALJ erroneously

failed to consider the medical evidence of Drs. Miller and Brenner with regard to pain; erroneously failed to consider the opinions of psychologists Metzger, Oruwari and Bassi with regard to Plaintiff's mental health; and erroneously failed to consider Plaintiff's daily activities, medications, and diagnosis of depression as objective signs of pain.

"A claimant has the burden of proving that his disability results from a medically determinable physical or mental impairment." Polaski, 739 F.2d at 1321. However, testimony regarding pain is necessarily subjective in nature, as it is the Plaintiff's own perception of the effects of his alleged physical impairment. Id.; Halpin v. Shalala, 999 F.2d 342, 346 (8th Cir. 1993). Because of the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect. Id. at 1321-22. The Eighth Circuit addressed this difficulty in Polaski, and established the following standard for the evaluation of subjective complaints:

> "The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain;

> (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions."

Id. at 1322.

Although the ALJ is not free to accept or reject the claimant's subjective complaints based upon personal observations alone, he or she may discount such complaints if there are inconsistencies in the evidence as a whole.  Id.  The "crucial question" is not whether the claimant experiences symptoms, but whether his credible subjective complaints prevent him from working.  Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th Cir. 2003).  When an ALJ explicitly considers the Polaski factors and discredits a claimant's complaints for a good reason, that decision should be upheld.  Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001).  The credibility of a claimant's subjective testimony is primarily for the ALJ, not the courts, to decide, and the court considers with deference the ALJ's decision on the subject .  Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005).

In the instant matter, although the ALJ did not specifically cite Polaski, he listed all of the necessary factors therefrom, and specifically cited 20 CFR 404.1529 and 416.929, the regulations corresponding with Polaski and credibility determination.  (Tr. 18.)  The ALJ set forth numerous inconsistencies in the record to support his conclusion that Plaintiff's complaints were not credible.  (Tr. 22.)

The ALJ noted that Plaintiff had an excellent work record up to and including his alleged onset date of disability. (Tr. 19.) However, the work record is but one factor to be considered when assessing credibility. The ALJ noted the lack of evidence from lay witnesses corroborating Plaintiff's allegation of disability. (Tr. 22.) The ALJ noted that the record consisted primarily of the VAMC treatment records from January 2001 to August 2004, most of which predated the alleged onset of disability, and noted that Plaintiff's treatment there was primarily conservative. (Tr. 19); See Black, 143 F.3d at 386 (conservative treatment is inconsistent with allegations of disabling pain).

Plaintiff argues that the ALJ erroneously failed to consider the opinions of Drs. Miller,[34] Brenner, Oruwari, Metzger, and Bassi. In his opinion, the ALJ discussed Plaintiff's medical treatment and concluded that, with the exception of Dr. Miller as discussed, *supra*, no doctor who treated or examined Plaintiff has stated that he was disabled or totally incapacitated; nor has any such doctor placed any specific long-term limitations on Plaintiff's ability to perform basic exertional activities. (Tr. 22.) The undersigned notes that the records of Dr. Metzger and Psychologist Bassi, as discussed, *supra*, do not support Plaintiff's allegation of disability. Similarly, neither Dr. Brenner nor Dr. Oruwari opined that Plaintiff was disabled. In fact, Plaintiff

---

[34]As discussed in detail, *supra*, the ALJ's decision to discredit Dr. Miller's opinions was based upon good reasons and substantial evidence.

failed to follow Dr. Brenner's recommendation to undergo facet injections to treat his alleged lumbosacral pain. (Tr. 847); <u>See Haley v. Massanari</u>, 258 F.3d 742, 747-48 (8th Cir. 2001) (ALJ properly discredited subjective complaints of disabling symptoms because of failure to follow through with recommended treatment); <u>see also</u> <u>Dunahoo v. Apfel</u>, 241 F.3d 1033, 1039-40 (8th Cir. 2001) (Failure to follow through with recommended treatment is an appropriate basis to deny disability benefits).

Although the ALJ is required to develop the record fully and fairly, the ALJ is not required to discuss in detail every piece of evidence submitted, and a failure to cite to certain evidence does not mean it was not considered. <u>Brewster v. Barnhart</u>, 366 F.Supp. 2d 858, 872 (E.D. Mo., 2005), <u>citing</u> <u>Black v. Apfel</u>, 143 F.3d 383, 386 (8th Cir. 1998). In this case the ALJ fully and fairly developed the record, and considered all of the relevant medical evidence and it's impact upon Plaintiff's alleged disability.

Regarding the Plaintiff's daily activities, the ALJ found that they were restricted by Plaintiff's own choice, rather than by any apparent medical proscription. (Tr. 22.) The ALJ further noted that the medical evidence established no evidence of any musculoskeletal impairment that would impair Plaintiff's ability to ambulate effectively or perform fine or gross motor movements on a sustained daily basis. <u>Id.</u> The ALJ found no credible medical reason why the Plaintiff should have severe restrictions in

performing any exertional activities, or why Plaintiff should need to use a cane at all, much less "95% of the time," as Plaintiff testified. Id. As discussed *supra*, with the exception of Dr. Miller, none of Plaintiff's doctors advised him to limit his activities as severely as Plaintiff did. Gill v. Barnhart, 2004 WL 1562872, *7 (8th Cir. 2004) (ALJ properly discredited Plaintiff's testimony regarding self-limitation of physical activities when such limitations were inconsistent with medical advice). The ALJ further noted the absence of adverse, uncontrollable side effects from Plaintiff's medications, and further noted that any adverse side effects Plaintiff may have suffered were presumably eliminated by altering the medication type or dosage. (Tr. 22.) The ALJ further noted that Plaintiff did not have most of the signs typically associated with chronic, severe musculoskeletal pain such as muscle atrophy, persistent or frequently recurring muscle spasms, neurological deficits, or other signs of nerve root impingement (abnormal x-rays or other diagnostic tests, positive straight-leg raising, inflammatory signs, or bowel or bladder dysfunction). (Tr. 22); 20 C.F.R. §404.1529(a) and §404.1528(b).

The ALJ concluded that Plaintiff's allegation of impairments producing symptoms of sufficient severity to preclude all sustained work activity was not credible. (Tr. 23.) The ALJ found no credible, medically-established reason to restrict Plaintiff to anything less than the full range of light work.

In consideration of all of the foregoing, the ALJ

determined that Plaintiff's subjective testimony of symptoms sufficient to preclude all sustained work activity was not credible. Id. A review of the ALJ's decision shows that, in a manner consistent with and as required by Polaski, the ALJ considered plaintiff's subjective complaints on the basis of the entire record before him, and set out numerous inconsistencies detracting from plaintiff's credibility. The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). To the extent Plaintiff's strong work record bolsters his credibility, the inconsistencies in the record as a whole, as set out above, significantly outweigh this lone factor of credibility. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996). Because the ALJ's credibility determination is supported by good reasons and substantial evidence on the record as a whole, this Court must defer to the ALJ's credibility determination. Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992); Hogan, 239 F.3d at 962.

C.    Non-exertional impairments

        Plaintiff finally contends that the ALJ erred when he failed to elicit vocational expert testimony concerning Plaintiff's non-exertional impairments of pain, mental illness, and limited function in his left finger, and improperly relied upon the Medical-Vocational Guidelines ("Guidelines") to direct a finding that Plaintiff was not disabled.

When an ALJ determines, as here, that a claimant is
unable to return to his past relevant work, the burden shifts to
the Commissioner to show that the claimant is able to engage in
work that exists in the national economy. Harris v. Shalala, 45
F.3d 1190, 1194 (8th Cir. 1995), citing Sanders v. Sullivan, 983
F.2d 822, 823 (8th Cir. 1992). When only exertional impairments
are present, the Commissioner may meet this burden by relying on
the Medical-Vocational Guidelines. Bolton v. Bowen, 814 F.2d 536,
537 n.3 (8th Cir. 1987). In the presence of non-exertional
impairments, however, the ALJ may rely upon the Guidelines only if
he or she makes a finding, supported by the record, that "the non-
exertional impairment does not significantly diminish Plaintiff's
residual functional capacity to perform the full range of
activities listed in the Guidelines." Harris, 45 F.3d at 1194,
citing Thompson v. Bowen, 850 F.2d 346, 349-50 (8th Cir. 1988).
Absent such a finding, the Guidelines do not control, and the ALJ
must call a vocational expert or produce other similar evidence to
establish that there are jobs available in the national economy for
a person with the claimant's abilities. Harris, 45 F.3d at 1194;
Sanders v. Sullivan, 983 F.2d 822, 823 (8th Cir. 1992); Thompson,
850 F.2d at 350. The Eighth Circuit has provided some guidance in
applying this standard:

> In this context "significant" refers to
> whether the claimant's non-exertional
> impairment or impairments preclude the
> claimant from engaging in the full range of
> activities listed in the Guidelines under the

demands of day-to-day life. Under this standard isolated occurrences will not preclude use of the Guidelines, however persistent non-exertional impairments which prevent the claimant from engaging in the full range of activities listed in the Guidelines will preclude the use of the Guidelines to direct a conclusion of disabled or not disabled. For example, an isolated headache or temporary disability will not preclude the use of the Guidelines whereas persistent migraine headaches may be sufficient to require more than the Guidelines to sustain the [Commissioner's] burden.

Thompson, 850 F.2d at 350.

Pain is a non-exertional impairment. Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). "Use of the Guidelines is appropriate if the ALJ explicitly discredits subjective allegations of pain for a legally sufficient reason, such as inconsistencies in the record." Bolton, 814 F.2d at 538; see also Reynolds v. Chater, 82 F.3d 254, 258-59 (8th Cir. 1996); Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Cruse v. Bowen, 867 F.2d 1183, 1187 (8th Cir. 1989).

In the instant matter, the ALJ found that Plaintiff could not return to his past relevant work, but had the residual functional capacity to perform substantially all of the requirements of light work. As discussed supra, the ALJ further found no documented evidence of any non-exertional pain seriously interfering with or diminishing Plaintiff's ability to concentrate, nor was there any evidence that Plaintiff's alleged physical symptoms were the product of any mental impairment. (Tr. 22.) The

ALJ further found, as discussed, *supra*, that Plaintiff's subjective complaints of pain were inconsistent with the objective medical evidence contained in the record; i.e., he lacked most of the physical signs typically associated with chronic, severe musculoskeletal pain, and noted that the medical evidence established "no inability to ambulate effectively or to perform fine and gross movements effectively on a sustained basis due to any underlying musculoskeletal impairment." (Tr. 22); <u>Bolton</u>, 814 F.2d at 538 (Use of the Guidelines is appropriate if the ALJ explicitly discredits subjective allegations of pain for a legally sufficient reason, such as inconsistencies in the record). The ALJ found that Plaintiff's basic abilities to think, understand, communicate, concentrate, get along with others and handle normal work stress have never been significantly impaired, substance abuse notwithstanding. (Tr. 23.) The ALJ noted that, with the exception of the time between April and June 2002 (which pre-dates Plaintiff's alleged disability) and the one-week hospitalization in December 2003, which appeared to be cocaine-induced, the record showed no acute mental disturbances.[35] The ALJ noted that, during the hearing, Plaintiff demonstrated no obvious signs of depression, anxiety, memory loss, or other mental disturbance. <u>Id.</u> The ALJ noted that Plaintiff's allegations of significant impairments were

---

[35]As noted, *supra*, the ALJ added that, even if Plaintiff were a frequent drug user, it had gone on for many years and never prevented Plaintiff from being gainfully employed, and in fact, some of Plaintiff's best earning years were during what he claimed were periods of substance abuse. (Tr. 23.)

not credible, as discussed, *supra*.  <u>Id.</u>  Finally, the ALJ, having discredited Dr. Miller's opinion as discussed, *supra*, found no evidence that Plaintiff's left ring finger presented a genuine long-term concern.

The undersigned concludes that in the present case the ALJ's use of the Guidelines was proper.  There is substantial evidence in the record to support the determination that Plaintiff's alleged non-exertional impairments did not significantly diminish his RFC to perform a full range of light work.  Considering Plaintiff's age, education, past work experience, and the ALJ's proper decision to discount Plaintiff's subjective symptoms of disabling pain, the undersigned cannot say that the ALJ erred in failing to elicit the testimony of a vocational expert.  The ALJ's decision to rely upon the Guidelines and not call a vocational expert is supported by substantial evidence on the record as a whole.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be affirmed and that Plaintiff's Complaint be dismissed with prejudice.

The parties are advised that they have eleven days in which to file written objections to this Report and Recommendation. Failure to timely file objections may result in waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).

_Frederick R. Buckles_
_____
UNITED STATES MAGISTRATE JUDGE

Dated this 12th day of July, 2006.